**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 91-1779
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

DANIEL UGOCHI IHEGWORO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Mississippi
_____

Before SMITH and EMILIO M. GARZA, Circuit Judges, and RAINEY,[*] District Judge.

JERRY E. SMITH, Circuit Judge:

Daniel Ihegworo was convicted of possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1). He now challenges his sentence, contending that the district court misapplied U.S.S.G. § 5K2.1, which permits an upward departure "[i]f death resulted" from the defendant's conduct. Finding no error, we affirm.

_____

[*] District Judge of the Southern District of Texas, sitting by designation.

On several occasions, Ihegworo sold heroin to Elnora Wilson and to other women. On one of these occasions, Ihegworo gave a quantity of heroin to Wilson and asked her to deliver it to Elizabeth Love. Three or four hours after Wilson did so, she learned that Love had died of an overdose. The heroin discovered in Love's apartment was found to be ninety-three percent pure.

After learning of Love's death, Wilson called the police and reported her involvement in the incident. She then agreed to act as a confidential informant. When Wilson arrived at Ihegworo's apartment on September 27, 1990, she wore a hidden microphone. At that time, Ihegworo advised her not to talk to the police about Love's death and told her that if she were arrested, he would make arrangements to get her out of jail.

Wilson went to see Ihegworo the next day, accompanied by an undercover police officer. The two purchased heroin from Ihegworo, but he refused to let them leave with the substance. He expressed his intent to supervise his purchasers' use of the heroin for fear that one of them might die if allowed to use the heroin without such supervision. Other officers then arrived on the scene and arrested Ihegworo. The heroin Ihegworo had sold was ninety-seven percent pure.

Ihegworo pleaded guilty to possessing 40.6 grams of heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1). At sentencing, the court noted that a base offense level of 18 would be applicable at the outset, reflecting an initial level of

$20^1$ reduced by two points for acceptance of responsibility. U.S.S.G. § 3E1.1(a). Given that Ihegworo had no previous criminal convictions, the court found that Criminal History Category I was applicable; this yielded a sentencing range of twenty-seven to thirty-three months.

The court then decided to depart upward from this range based upon two factors. The first involved section 5K2.1, which permits an upward departure "[i]f death resulted." The court concluded that "[a] preponderance of the evidence . . . clearly relates Elizabeth Love's overdose death to the heroin the defendant was distributing." The second involved U.S.S.G. § 2D1.1 application note 9, which allows the court to depart upward when the crime involves "[t]rafficking in controlled substances . . . of unusually high purity." The court noted that the average purity of heroin sold "on the street[]" is "between 13 percent and 20 percent" S)Q significantly lower than the purity of the heroin found in Ihegworo's possession.

Based upon these two factors, the court sentenced Ihegworo to ninety-seven months' imprisonment.[2] Ihegworo now appeals the

---

[1] U.S.S.G. § 2D1.1(c)(12) assigns a Base Offense Level of 20 to offenses involving "[a]t least 40 G but less that 60 G of Heroin . . . ."

[2] The court justified the length of sentence on the fact that had the defendant been sentenced for distributing heroin that eventually caused death or serious bodily injury, 21 U.S.C. § 841(b)(1)(C),

> the offense level would have been 38. The 97 months is the top end of an offense level of 26 which is a little less than midway between the offense level of 18 and 38, and takes into account the extent to which the Defendant's conduct reflected death was knowingly risked.

It is plain from the record that the court was looking at the sentencing ranges for level 28, which has a range of 78-97 months, and not for level 26.

upward departure.

                                    II.

Section 5K2.1 permits sentencing courts to "increase the sentence above authorized the guideline range" if "death resulted." Ihegworo contends that an upward departure based upon section 5K2.1 was not warranted in his case because (1) his conduct did not fall within the criteria listed in the section and (2) Love was not a victim of the offense of conviction.

A departure from the guidelines is within the discretion of the sentencing judge, and we affirm the decision to depart if it was reasonable in light of the appropriate sentencing factors. United States v. Siciliano, 953 F.2d 939, 942 (5th Cir. 1992). As the Supreme Court recently stated, the congressional act establishing the sentencing guidelines "did not alter a court of appeals' traditional deference to a district court's exercise of its sentencing discretion. . . . [T]he decision to depart from the range in certain circumstances [is a] decision[] that [is] left solely to the sentencing court." Williams v. United States, 60 U.S.L.W. 4206, 4209, 4210 (U.S. Mar. 9, 1992).

---

As noted below, see infra note 9, the defendant does not challenge the extent of the departure but only the district court's decision to depart as an initial matter. As the district court's apparent misstatement relates to the extent of departure, we do not consider it as a ground for error.

4

A.

Section 5K2.1 provides that the sentencing judge

> must give consideration to matters that would normally
> distinguish among levels of homicide, such as the
> defendant's state of mind and the degree of planning or
> preparation.   Other appropriate factors are whether
> multiple deaths resulted, and the means by which life was
> taken.   The extent of the increase should depend on the
> dangerousness of the defendant's conduct, the extent to
> which death or serious injury was intended or knowingly
> risked, and the extent to which the offense level for the
> offense of conviction . . . already reflects the risk of
> personal injury.

Ihegworo argues that his conduct does not fall within the factors listed in section 5K2.1 as a factual matter and that therefore the district court should not have departed from the guidelines based upon that section.   Among other things, he contends that he "did not anticipate death resulting" from his actions, that he "did not plan or prepare for the death of" Love, and that multiple deaths did not result from his conduct.

As an initial matter, we reject Ihegworo's implicit argument that his conduct must meet all the section 5K2.1 factors before a court may use the section as a basis for an upward departure.   The only "mandatory" language in the section is that the judge "must" consider matters that "normally distinguish among levels of homicide," such as state of mind.   In this case, the court utilized this very approach:   It found that "the Defendant appreciated the dangerousness of the drug he was distributing" and that he "reasonably foresaw death or serious bodily injury as a result of the heroin he was distributing."   It also noted that the sentence reflected the fact that the "death was knowingly risked."

5

Ihegworo responds that, assuming that he had some connection to the death of Love,[3] he could have "appreciated" the risk of death only <u>after</u> Love's death occurred and that the court improperly considered post-death state-of-mind evidence. This argument is without merit. Ihegworo was distributing extraordinarily pure heroin directly to "junkies" and users, rather than to other distributors who would be expected to dilute the drug for resale purposes.[4] In fact, by his own admission Ihegworo "did not allow anyone to take heroin outside his presence to use." The fact that he would not allow others to use the heroin outside of his presence demonstrates his knowledge of the dangerousness of the drug.[5]

We accord the district court "wide discretion to decide whether aggravating factors exist to support an upward departure." <u>Siciliano</u>, 953 F.2d at 942 (quoting <u>United States v. Hatch</u>, 926 F.2d 387, 396-97 (5th Cir.), <u>cert. denied</u>, 111 S. Ct. 2239 (1991)). In this case, we find that the departure was reasonable.

B.

---

[3] Ihegworo contends that the district court's factual finding on this issue was clearly erroneous. <u>See</u> <u>infra</u> note 8.

[4] This is a slightly different concern from that underlying application note 9, which suggests that "[t]rafficking in controlled substances . . . of unusually high purity may warrant an upward departure . . . ." The note goes on to state that "[s]ince controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." By contrast, in relation to § 5K2.1, the district court was concerned with the risk of death associated with distributing extraordinarily pure heroin directly to users.

[5] Ihegworo also argues that the sentencing guidelines range for possession of heroin with intent to distribute "reflects the risk of personal injury inherent in the abuse of controlled drugs." In this case, however, the risk was unique, given the purity of the drug.

Ihegworo also argues that section 5K2.1 is inapplicable as a matter of law because Love was not the "victim" of the offense of conviction.[6]  At the time Ihegworo committed the offense, section 5K2.0, entitled "Grounds for Departure," cautioned that

> Harms identified as a possible basis for departure from the guidelines should be taken into account only when they are relevant to the offense of conviction . . . .[7]

In <u>United States v. Roberson</u>, 872 F.2d 597, 603 (5th Cir.), <u>cert. denied</u>, 493 U.S. 861 (1989), we interpreted this limitation to require "a nexus" between the harm caused and the offense of conviction.[8]  We also noted that the nexus requirement applied to section 5K2.1.  <u>Id.</u>  The district court in this case found such a "nexus" between the death of Love and the offense of conviction.

Ihegworo contends that the death of Love could not meet the

_____

[6]    We review the district court's legal conclusion <u>de novo</u>.  <u>Siciliano</u>, 953 F.2d at 942.

[7]    Sentencing courts apply the version of the guidelines in place at the time of sentencing unless such application would cause <u>ex post facto</u> concerns. <u>United States v. Suarez</u>, 911 F.2d 1016, 1021-22 (1990); <u>United States v. Brown</u>, 920 F.2d 1212, 1216 (5th Cir.), <u>cert. denied</u>, 111 S. Ct. 2034 (1991). When the events in question took place in this case (September 1990), § 5K2.0 contained the relevancy limitation, which was deleted November 1, 1990, because it was "unclear and overly restrictive."  U.S.S.G., app. C, amend. 358.  Given that the deletion of the relevancy limitation "is not simply a change in procedure which does not affect a matter of substance," <u>Suarez</u>, 911 F.2d at 1022, the change raises <u>ex post facto</u> concerns.  The district court, therefore, was correct in applying the version of the guidelines in place at the time the offense occurred.

[8]    The Ninth Circuit recently explained the § 5K2.0 relevancy requirement in a similar fashion:

> We conclude that, with respect to acts of misconduct not resulting in conviction, the Commission intended to preclude departures for acts bearing no relation- ship to the offense of conviction, but to permit departures for acts that relate in some way to the offense of conviction, even though not technically covered by the definition of relevant conduct.

<u>United States v. Loveday</u>, 922 F.2d 1411, 1417 (9th Cir. 1991) (quoting <u>United States v. Kim</u>, 896 F.2d 678, 684 (2d Cir. 1990)).

7

"nexus" requirement because Love was not the "victim" of the offense of conviction. He states that the only possible victims of the offense for which he was convicted would be Wilson and the undercover agent, and he adds that Love was not even involved in the transaction that led to his conviction. Thus, he gives the "nexus" requirement a very narrow reading: The "harms" covered by section 5K2.1 must be not only offense-specific, but also victim-specific. In other words, not only must there be a nexus between the harm caused and the offense of conviction, but the harm must have been suffered by the victim of the instant offense.

We decline to adopt such a narrow interpretation of section 5K2.0's limitation. It is true that Roberson speaks in terms of the victim of the offense. At one point, the Roberson panel noted that "section[] 5K2.1 . . . allow[s] the [sentencing] court to depart from the Guidelines if the victim of the offense suffered death . . . ." Id. But Roberson did not even address the question of whether the harm, in order to be "relevant," must be suffered by the victim of the instant offense. Rather, the Roberson panel was asked to address whether the "nexus" limitation applied to section 5K2.8, which permits the court to enhance a defendant's sentence where his "conduct was unusually heinous, cruel, brutal, or degrading to the victim . . . ."

In Roberson, we discussed section 5K2.1 only in contrast to section 5K2.8. We drew a distinction between those guideline sections to which the nexus requirement applied and those to which it did not; we held that the nexus requirement did not apply to

8

section 5K2.8 because it focused on the defendant's conduct, not the harms resulting from the conduct. We used section 5K2.1 as an example of a section to which the nexus requirement would apply, noting that "[t]he victim's harm is the focal point" of section 5K2.1. Id. Our point was not that the victim of the offense of conviction must suffer the harm for purposes of section 5K2.1, as Ihegworo argues, but rather that the nexus limitation applies to section 5K2.1 because that section focuses on harm.

In most cases, the harm involved will be suffered by the victim of the instant offense. We obviously assumed this in Roberson. However, the language of the guideline does not so require. Rather, the section 5K2.0 merely states that the harm at issue must be "relevant" to the offense of conviction. We decline the defendant's invitation to narrow "relevancy" to victim-specific harm when the language of the guideline does not require such a reading.

Having decided that the "nexus" requirement does not include a "victim-specific" component, we uphold the district court's finding that the death of Love "clearly relates" to the offense of conviction. Love died from ingesting the extraordinarily pure heroin that Ihegworo was in the business of distributing.[9] We find

---

[9] Ihegworo argues that the court's finding "that the death of Elizabeth Love resulted from the defendant's possession with intent to distribute is clearly erroneous," and he "denies that the death of Elizabeth Love resulted from a heroin overdose, contrary to the Court's finding." At the sentencing hearing, Wilson testified that Ihegworo gave her some heroin and asked her to delivery it to Love. Wilson did so, and when she returned to Love's residence three or four hours later, she learned that Love had died. She then called the hospital, and was told that Love had died of a heroin overdose. She immediately called the police to report her involvement in the incident. The heroin found in Love's apartment was 93% pure; the heroin found in Ihegworo's possession at the time of his arrest was 97% pure.

that this is a sufficient nexus to satisfy the dictates of Roberson.[10]

AFFIRMED.

---

We find that this is more than enough evidence to support the court's finding that (1) Love died from an overdose and (2) she overdosed on drugs distributed by the defendant. That the United States Attorney's Office determined that it lacked sufficient evidence to charge Ihegworo with distributing heroin that caused death or serious bodily injury, see 21 U.S.C. § 841(b)(1)(C), does not require a different result.

Ihegworo makes a slightly different argument attacking the "competen[cy]" of the death-by-overdose evidence. At the sentencing hearing, Ihegworo's attorney objected, presumably on hearsay grounds, to Wilson's testimony that she had learned of Love's overdose from the hospital. We find that this evidence was properly admitted. Hearsay may be considered by a sentencing court, provided that it is supported by sufficient indicia of reliability. United States v. Chavez, 947 F.2d 742, 746 (5th Cir. 1991). In this case, Wilson's testimony was sufficiently reliable; her testimony was against her penal interest, and she was testifying without a grant of immunity.

[10] Ihegworo contests only the court's decision to depart from the guidelines range as an initial matter and not the extent of the departure. See Siciliano, 953 F.2d at 942 (review of upward departures is a two-step process; reviewing court must first consider whether decision to depart was reasonable in light of appropriate sentencing factors, and then must determine "whether the extent, or length, or the departure is reasonable"). We therefore do not consider whether the extent of the departure was reasonable. See also Williams, 60 U.S.L.W. at 4209 (describing the two-step process as follows: "First, was the sentence imposed either in violation of law or as a result of an incorrect application of the Guidelines? . . . If [not]: is the resulting sentence an unreasonably high or low departure from the relevant guideline range?").